BUEHLER *v.* BEADIA.

AUTOMOBILES—INTERSECTIONS—TRAFFIC LIGHTS—EQUALLY DIVIDED COURT.

> Judgment by trial court in a nonjury case, rendered for plaintiff northbound motorist who had stopped in obedience to a traffic light at a street intersection and when light turned in her favor proceeded across until struck by defendant's eastbound truck which was then running against the traffic light at speed of 40 miles per hour in a zone where maximum lawful speed was 25 miles per hour, is affirmed by an equally divided court.

Appeal from Kalamazoo; Fox (Raymond W.), J. Submitted April 7, 1955. (Docket No. 41, Calendar No. 46,241.) Decided December 1, 1955. Rehearing denied March 1, 1956.

Case by Adah Buehler against Edward S. Beadia and Consolidated Freight Company, a corporation, to recover damages for personal injuries sustained in collision between her automobile and motor tractor. Case tried without jury. Judgment for plaintiff. Defendants appeal. Affirmed by an equally divided court.

*Stratton, Wise, Sykes, Early & Starbuck (B. W. Wise,* of counsel), for plaintiff.

*Howard & Howard,* for defendant Beadia.

*Frost, Ford & Kriekard (Gordon H. Kriekard,* of counsel), for defendant Consolidated Freight Company.

REFERENCES FOR POINTS IN HEADNOTES
3 Am Jur, Appeal and Error § 1160.

REID, J. (*for reversal*).  Plaintiff brought suit to recover damages for personal injuries sustained in a collision between a car owned and operated by herself, and a Chevrolet tractor which was being driven by defendant Beadia without the semitrailer attached thereto which it was designed to draw. Plaintiff claims that Consolidated Freight Company, defendant, was the owner of the truck. Ownership is denied by Consolidated Freight Company. Ownership is claimed by defendant Beadia. The case was tried by the court without a jury. From a judgment for plaintiff of $6,187.50 and costs, defendants appeal.

About 8:45 a.m., November 23, 1951, plaintiff was operating a 1941 Plymouth automobile owned by her in a northerly direction on Westnedge avenue and arrived at the intersection of Westnedge and Michigan avenues in the city of Kalamazoo, Michigan. Westnedge avenue is a trunk-line highway running north and south (highway US–131) and Michigan avenue is also a trunk-line highway running east and west (highway US–12). When plaintiff arrived at the intersection the traffic control signal light at the intersection was red for north and south traffic and she stopped her car at the crosswalk; there was no car ahead of her. Witness Alden P. Finney was also traveling north on Westnedge avenue back of plaintiff and stopped his car at the intersection on plaintiff's right, abreast of plaintiff's car. As plaintiff was waiting at the intersection, defendant Beadia was approaching from the west on US–12 (Michigan avenue) at a speed as testified by plaintiff's witness Schon, of at least 40 miles an hour. The posted speed is 25 miles an hour. Witness Schon testified that he, Schon, was driving ahead of the truck of defendant but swerved to his right and came to a complete stop at the intersection in question, and that the truck driven by Beadia passed

him; that he, Schon, had been driving about 30 miles an hour and that when he pulled over to the south side of Michigan avenue, Beadia driving the truck, passed him at 40 miles an hour and that he, Schon, as he drove up to the intersection and angled over toward the curb, could see that the truck was not reducing its speed, and could see that although he, Schon, was stopping, the truck was not going to stop; that the plaintiff's car did not start up until after witness Schon's car had stopped; that there were only the cars of plaintiff and Finney at the intersection when he, Schon, stopped, the intersection being otherwise clear. We hereinafter quote the testimony of plaintiff and also of defendant Beadia as to the collision that occurred.

Plaintiff testified on direct examination,

"As I came up to the corner the light was red, I stopped beside a car that was standing next to the curb, and waited for the light on the northeast corner to turn green."

She also testified on cross-examination,

"I stopped at the south sidewalk line for Michigan avenue."

Further on cross-examination, plaintiff testified:

"If I had applied my brakes, which were in good working order, and moved from the position in which I was waiting for the light, at any point between the time I passed the curb line of the south side of Michigan, I was going slow enough so I think I could have stopped in less than a car length."

And further on cross-examination,

"I don't recall whether I looked to the west and saw the truck coming. I drove out into the intersection because the green light was on on the northeast corner; I was watching my green traffic light. *I didn't look and didn't see the defendant between*

*the Kroger store and the intersection I was about to enter.. I can't recall whether I looked to the west to see if there was any truck coming before I started out,* and I don't recall whether I saw any cars standing there on the west side of the southwest corner of Michigan at the time I started out." (Italics supplied.)

The Kroger store is shown by other testimony to be 450 feet west of the center of the easterly half of Westnedge avenue.

Plaintiff further testified that as she started up there were no cars coming south on Westnedge and,

"*Q.* No cars still traveling east or still traveling west?

"*A.* Not that I *know of.*" (Italics supplied.)

It appears from the testimony of witness Schon that as Beadia came close to the intersection, he, Beadia, applied his brakes and left tire marks maybe 20 feet on the pavement beginning at the crosswalk line, and turned left—if he had gone straight he wouldn't have hit plaintiff. Plaintiff testified:

"When it [the light on the northeast corner] turned green I started across, looked to the east and there was no traffic—no cars stopped there. As I went across I looked at my light; then I turned and looked to the west and here was this tractor and it was so close to me that it obstructed my view, and it swerved. Just as I looked and saw it, it swerved and plowed right into my door where I was sitting on the driver's side, and I heard it grind, saw the glass shatter. I hollered and started sliding right across the seat, the seat broke loose and went out from under me, and I went down on the floor over on the east side of the car, the doors opened and I went through the door, my feet were still in the car and I was across the running board. I landed on my shoulder—my head was on the ground."

Defendant Beadia testified,

"*Q.* How far out into the intersection was she when you discovered her?

"*A.* I would say about a car length.

"*Q.* Was she moving into your line of travel?

"*A.* She was.

"*Q.* And your car was where at that time?

"*A.* A short distance from the corner there.

"*Q.* Were you on the crosswalk of Michigan avenue—over the crosswalk of Michigan at the time?

"*A.* I was.

"*Q.* At the time you saw her drive out into Michigan?

"*A.* That is true.

"I was on or over the crosswalk of Michigan avenue when I first saw her. I put on my brakes and skidded to the left in an effort to avoid the collision, but the front end of my tractor struck the left side of her car. The impact occurred to the south of center of intersection. I don't believe her car had reached the center of Michigan avenue when the impact occurred, my vehicle then moved a little to the side."

The trial court correctly found defendant Beadia guilty of negligence.

Regardless of the weight given defendant's testimony, from undisputed testimony in the case it appears that if plaintiff had looked to the west as she was in her car at the south side of the intersection, she would have seen the approaching truck driven by defendant Beadia and if she had given the truck even momentary attention, she could have seen that it was not slowing down. She did not look; she paid no attention whatever to any traffic coming from the west, and, hence, formed no judgment respecting it. The truck was proceeding in the northerly lane of eastbound traffic on Michigan. By the time plaintiff reached the southerly side line of the

pavement on Michigan avenue after leaving the sidewalk line, she should have noticed that the continuing speed of the truck would jeopardize her progress. Before she reached the southerly side line of the eastbound traffic lane in which the truck was traveling, she should have known that the danger of collision was imminent. She was not entitled to the extent of total inattention on her part, to rely on other drivers obeying with mechanical precision all the rules governing their conduct. Many a driver negligently has driven through an intersection after the green light had on his near approach ceased to give him permission to continue.

In *Morse* v. *Bishop,* 329 Mich 488, we say, pp 490–492:

"Plaintiff cities *Travis* v. *Eisenlord,* 256 Mich 264, as authority for his contention and theory that he had a right to rely on the green light in his favor and upon the assumption that defendant would heed the red light against him, obey the law and stop, obviating any necessity on plaintiff's part for looking to see whether his assumption was well founded. * * * Whatever the construction to be placed upon the *Travis Case,* it is plain that in a subsequent case, *Boyd* v. *Maruski,* 321 Mich 71, the majority of this Court rejected the above contention of the plaintiff and held guilty of contributory negligence as a matter of law a plaintiff who crossed a street under protection of a green traffic light, but who, after seeing defendant's vehicle standing across the street to her right as if waiting for the red light against it, failed to make further observation of it while she continued across the street. * * *

"Plaintiff's theory is equally exploded by the reasoning in our opinion in *Long* v. *Garneau,* 319 Mich 291, and its analysis of the cases cited therein, although in that case plaintiff's contributory negligence, as found by the Court, was not necessarily determined as a matter of law. In that case we said [p 309]: * * *

" ' "Before crossing a street, a pedestrian must (1) make proper observation as to approaching traffic, (2) observe approaching traffic and form a judgment as to its distance away and its speed, (3) continue his observations while crossing the street, and (4) exercise that degree of care and caution which an ordinarily careful and prudent person would exercise under like circumstances." *Malone* v. *Vining* (syllabus), 313 Mich 315.' "

Plaintiff in this case, while waiting to enter the intersection, was in a place of safety; she would not have jeopardized her safety if she had looked to the left; she is without excuse for not looking and is to be held negligent.

The duty of a driver of an automobile and the duty of a pedestrian, as to entering with the green light into a street intersection, are similar, but there are differences in the imminence and sources of threatening danger and in the kind and degree of ability to avoid the danger. For example, the full length of the side of an automobile causes a broad interruption of traffic approaching from right or left, which interruption might be avoided by a pedestrian by a quick step forward or back. A pedestrian may find himself required to keep a sharp lookout for unevenness of street surface to avoid stumbling in front of approaching traffic, which lookout needs to be much more detailed, accurate and nearly continuous than would be required of the driver. There are, of course, differences between drivers, and among pedestrians, as to ability to avoid danger after discovery that some driver has entered negligently. It is almost impossible to find 2 cases alike in all their circumstances. The opinion of Mr Justice BUTZEL in *Ortisi* v. *Oderfer,* 341 Mich 254, a case of a pedestrian plaintiff, does not govern the instant case, where a driver is plaintiff and circumstances

differ. However, we quote from Justice Butzel's opinion in the *Ortisi Case* the following (p 261):

"All we hold here is that one who crosses with the light in his favor cannot, except in the face of a peril that is reasonably apparent, be guilty of contributory negligence as a matter of law."

In no situation could the danger be apparent to the driver who did not look.

In the instant case the driver plaintiff apparently was under no necessity for observing an uneven condition of the intersection and, hence, her attention as to whether negligent drivers were approaching from her left was not diverted by reason of any rough condition of the street. Whatever calculations may be made as to when plaintiff could have anticipated a collision, the undisputed fact is in this case that the collision occurred near the middle of the intersection. She could have foreseen what did occur. Hence, plaintiff, with no other approaching or apparent danger threatening her, had every opportunity to observe the approach of defendant's truck, traveling with undiminished speed, in time to have prevented the collision. If there had been other approaching or threatening dangers that Mrs. Buehler was under necessity of observing, that might be considered (depending on all the circumstances) as excusing her from noticing defendant's truck; but there was no such other danger and she was without excuse.

The plaintiff had the burden of showing that she was free from contributory negligence but failed, in the instant case, to make any such showing. She did not observe the traffic before she started up, nor as she continued and reached the southerly side line of the Michigan avenue pavement nor as she continued into and through the intersection, until too late to prevent collision.

In *Kerr* v. *Hayes,* 250 Mich 19, 22, we say:

"As plaintiff did not look to the left he could not have formed any belief from the conditions. *He is chargeable with having seen what he should have seen,* that defendant's car was about twice the distance from the crossing as his own, approaching at about twice his own speed, without, at any time, giving any indication of according plaintiff the right-of-way, and that a collision was inevitable unless he took measures to avoid it." (Italics supplied.)

Plaintiff's negligence in proceeding into and in the intersection preceded the swerve of the truck to its left. Plaintiff's claim (as well as defendant's version) as to the swerve is that Beadia "put on his brakes and skidded to the left to avoid a collision." Such swerve does not excuse plaintiff's negligence, nor render the question of her negligence one of fact rather than of law as in *Harris* v. *Bernstein,* 204 Mich 685; *Grodi* v. *Mierow,* 244 Mich 511; and *Stephens* v. *Koprowski,* 295 Mich 213. On the contrary, the facts in this case bring it within our holding in *Lacaeyse* v. *Roe,* 310 Mich 591, in which defendant swerved to the left at the last moment in a frantic effort to avoid plaintiff's automobile which had suddenly pulled in front of him. We there held that the sudden swerving of defendant's automobile under such circumstances did not serve, as in the above cited *Harris, Grodi* and *Stephens Cases,* to transform the question of plaintiff's negligence for failure to maintain a proper lookout from a question of law to a question of fact. In this case, plaintiff's negligence included putting her car in the path of the steadily oncoming truck without even noticing it, and continuing her course with the result that the truck driver concluded he had to swerve to avoid her, and did swerve accordingly, thus causing the collision.

The plaintiff in the instant case took no timely precautions whatever to guard against danger approaching on her left and therefore it cannot be said that she used reasonable precaution. The green light is a permisison to travel, not a guarantee of safety.

The finding of the trial judge that plaintiff was free from contributory negligence is against the undisputed evidence and erroneous. Judgment for plaintiff should be reversed. The case should be remanded to the trial court with instruction to set aside the judgment entered by him and enter a judgment for the defendants of no cause of action. Costs to defendants.

CARR, C. J., and SHARPE and DETHMERS, JJ., concurred with REID, J.

BUTZEL, J. (*for affirmance*). The light turned green and plaintiff commenced to cross the intersection. She first looked to the right and then started to look to the left, but as she did so the collision occurred. My Brother concludes that she was guilty of contributory negligence as a matter of law. I cannot agree with this result or the application to this case of the basis for it. His opinion is largely premised upon the statement made in a case* not involving a traffic signal that "He is chargeable with having seen what he should have seen." What a person "should" see, I think, depends primarily upon the extent of his duty to observe and is not to be interpreted as if it were "could." Does the law impose upon her the absolute duty to have looked to the left?

In *Ortisi* v. *Oderfer*, 341 Mich 254, four members of this Court, Mr. Justice REID among them, held that where a pedestrian was crossing an intersection un-

---

* *Kerr* v. *Hayes*, 250 Mich 19, 22.—REPORTER.

der the protection of a traffic signal which was still green when he was struck, he was not contributorily negligent as a matter of law, even in the absence of testimony that he attempted to observe approaching vehicles. The basis of the decision was that under those circumstances a pedestrian need not anticipate that approaching vehicles will disregard the red signal. The rule should not be different where or because 2 automobiles are involved. The instant situation presents a much stronger case for the plaintiff than the *Ortisi Case* for here there is evidence that plaintiff did undertake to look at oncoming traffic. However, this fact is not decisive. My Brother bars recovery as a matter of law, because she did not look in the direction from whence defendant came, *i.e.*, through the red light. This is entirely inconsistent with the opinion in which he concurred in the *Ortisi Case* to the effect that she was under no absolute duty to look in that direction at all, as she need not have anticipated that the defendant would disregard the light. The only conclusion possible, if that principle is to be given effect, is to consider and hold that plaintiff was not contributorily negligent as a matter of law but that her negligence, if any, was solely a question of fact for the trier of facts.

It is urged by an appellant that such a rule in effect places a premium on not observing and that "the law certainly does not want to encourage drivers to enter intersections without making observation." The rule does not have that effect, and even if it did, we should not make the duty of observance so onerous that it becomes a physical impossibility for drivers and pedestrians to do all that is required of them and still reach their destination. It must be remembered that the question here is whether plaintiff was contributorily negligent as a matter of law. We say she was not. But it may be that a jury or trier of facts would think that a reasonable person should have so

observed under certain circumstances, and if the plaintiff in such a case did not so observe, she would not recover. All we say here is that the duty to anticipate the disregard of a signal under the circumstances of this case is not one of law, but purely one of fact. While to a very limited extent a "premium" is thus placed upon not looking, plaintiff must still persuade a jury of reasonable men or the trier of facts that she need not have looked under the circumstances.

Green and red light signals are not erected at street intersections for ornamental purposes. A green light is an invitation to the pedestrian or driver of a car to proceed across the street. A red light commands them to stop until the light turns green. It so frequently happens that cars come at a very rapid rate toward the red light. If one crossing with the green light cannot depend upon the safety the law affords him but must wait each time to see whether the driver approaching the red light will observe the law and stop, he may find himself in a dangerous position particularly if the light changes against him before he has completed his trip across the street.

The trial judge, sitting without a jury, further held:

"Assuming that she had an obligation to look, until she observed or should have observed that the truck was not going to stop, she was under no duty to anticipate he was going to violate the law, so I think any way you look at it, the plaintiff has established freedom from contributory negligence. I think as a matter of law she is not obliged to anticipate that someone was going to run the red light, but even if she is obliged under similar circumstances * * * to look, I think she is free from contributory negligence, negligence which contributed to this accident."

He was of the opinion that had the plaintiff been under an absolute duty to look to the left when or before she started across, the defendant's position at that time was such that plaintiff, as a reasonable person, could not have anticipated defendant's actions. If she had looked where and when my Brother feels it was her absolute duty to do, she would have seen the defendant approaching the intersection under such circumstances that it was not reasonably apparent he would do otherwise than stop in obedience to the signal. There is testimony that Beadia was driving at the rate of 40 miles per hour, though the legal rate of speed is 25 miles per hour. He must have been some distance from the crossing when plaintiff entered it. Had she looked immediately how would she have anticipated that he would violate the law? He tried to stop but at the rate he was going his truck skidded and the collision occurred. At most a question of fact is presented. Certainly we should not bar recovery as a matter of law for failure to fulfill a duty of observance, if any, in a case where as a matter of fact fulfillment of the duty would not have apprised the plaintiff of the impending danger. See *Ortisi* v. *Oderfer,* 341 Mich 254, 279. Accordingly, in addition to our opinion that plaintiff was not under an absolute duty to observe under all circumstances, we would also affirm the finding that plaintiff was not contributorily negligent as a matter of fact. The evidence does not clearly preponderate in the opposite direction. As plaintiff's recovery is not barred on this ground, we must consider other questions raised by appellants.

Defendant Beadia was the legal titleholder of the truck he was driving at the time of the accident on November 23, 1951. In 1950 he executed a written agreement with defendant Consolidated Freight Company, a Michigan corporation, whereby the company hired the use of defendant and his trucktrailer

to transport freight and merchandise. The lease was subject to termination by either party upon 5 days notice in writing. A succeeding lease was executed on November 15, 1951, embodying the same terms. It did not effect a change in the method of operation or the relationship between the parties. In addition to the leases it appears that Beadia was paid a certain percentage of the gross freight bill as his remuneration; that he did not work for anyone but the company during the period of the leases; that the company dispatched Beadia for the various jobs and told him where and when to pick up and deliver the loads, and that he was authorized by the company or the commerce commission to take only certain routes. Beadia was obliged to keep the truck in good running condition and to repair it. He was allowed to go any place for repair purposes, though he could purchase tires and fuel from the company. When not engaged in hauling he apparently used the truck for his own personal business.

Plaintiff asserts liability against the company under CLS 1954, § 257.401 (Stat Ann 1952 Rev § 9.2101), the "owner's liability" statute, or on the alternative ground that the company was Beadia's employer or master at the time of the accident. The trial court found the company to be an "owner." The statute, CLS 1954, § 257.37 (Stat Ann 1952 Rev § 9.1837), defines an "owner" as:

"(a) Any person, firm, association or corporation renting a motor vehicle or having the exclusive use thereof, under a lease or otherwise, for a period of greater than 30 days."

While the particular lease under which the company had rented the truck was executed just 8 days prior to the accident, it was obviously merely a renewal or extension of a similar lease which had been in effect for over a year. During that period the

driver had been in the sole and continous employ of the company. The mere existence of the 5-day cancellation provision does not affect the result. It is thus apparent that the company "rented" the truck and that it did so for more than a period of 30 days, and therefore is an "owner." The use of the alternative "or" in the statute would seem to indicate that an "exclusive use" is not required in all cases but is only an alternative to, and not necessarily synonymous with, "renting." However, even if the statute is interpreted as requiring an exclusive use in all cases, it is clear that such existed here. No other company used the truck and driver during the period of the relationship between Beadia and the company. The fact that the driver used his truck for his own personal benefit does not mean that the company did not have its exclusive use. Applied to this case all the statute requires is that no other company share the use of the truck for hauling freight.

Even if not an "owner" within the statutory definition it is apparent that the company was the employer of Beadia. The contract or lease provided that the company was to have control over the vehicle and that Beadia would not have it. In fact this was the situation, as is shown by the aforementioned facts that he was told where and when to go; that the company paid him; that he worked for the company exclusively; and that his routes were generally restricted, et cetera. There can be no doubt that the company was his employer within the principles laid down in other cases of a similar nature. See *Eber* v. *Bauer,* 252 Mich 571 (involving a lease somewhat similar to the one in this case); *Brinker* v. *Koenig Coal & Supply Co.,* 312 Mich 534; *Hazard* v. *Great Central Transport Co.,* 270 Mich 60; *Lewis* v. *Summers,* 295 Mich 20; *Dennis* v. *Sinclair*

*Lumber & Fuel Co.,* 242 Mich 89; *Lynn* v. *Roberts,* 257 Mich 116.

However, the company further argues that Beadia was not acting within the scope of his employment when the accident occurred. Contrary to plaintiff's contention, we have held this to be a proper inquiry even where the action "is not planted on the theory of a master's liability for the tort of his servant, but, rather upon the so-called owner's liability statute." *Freeza* v. *Schauer Tool & Die Co.,* 322 Mich 293, 296. In *Jeffries* v. *Jodawelky,* 304 Mich 421, 424, we stated:

"The deviation or departure from the business of the master is the important issue, as we pointed out in *Irwin* v. *Williamson Candy Co.,* 268 Mich 100, not the geographical deviation from a prescribed or 'feasible' route, as the deviation from the route arises as an incident to the departure by the servant from the scope of his employment. A deviation occurs when a route, which might otherwise have been permissible, is selected to carry out a mission personal to the employee."

The agreement between the parties contemplated that Beadia would make repairs and keep the truck in good running condition, however, whenever and wherever he deemed it feasible. At the time of the accident he was proceeding to Lansing to secure 2 tires to replace those which had been blown out on the trailer. He had left the trailer some distance away near New Buffalo, Michigan. This was not a "mission personal to the employee."

Appellants' final objection of sufficient merit to warrant consideration concerns the admission into evidence of certain testimony. Plaintiff was described as having a condition known as spondylolisthesis. The doctor who so stated testified that it was a defect of development and that "It can be symptomatic, it isn't only due to an injury." A second

doctor, an orthopedic specialist, testified over objection as follows, in answer to a hypothetical question concluding with the words, "can you say with reasonable medical certainty whether the accident just described was the competent, producing cause of an aggravation of the plaintiff's pre-existing condition?"

"I believe that there is a relationship between the hypothetical situation and the conditions described and the accident reported in that question.

"Q. What is your opinion, that the accident was or was not the competent producing cause?  *  *  *

"A. It is my opinion that the accident was the cause.  *  *  *

"Q. Now, Doctor, based on the same facts in the hypothetical question, do you have an opinion as to whether the accident and this aggravation that you have just testified to is the competent producing cause of the plaintiff's present condition?  *  *  *

"A. It is my opinion there is a relationship between the plaintiff's symptoms and the accident."

There followed further medical testimony by this same doctor concerning the probable duration of the plaintiff's condition and the possibility of alleviating it by surgery. Appellants have objected to the reception of the quoted answer on the ground that it amounted to opinion evidence of, or a conclusion upon, the ultimate fact which was solely within the province of the jury—the cause of plaintiff's condition. No objection can be made to the materiality and relevance of expert opinion evidence on the fact of causation, but rather the objection here goes to the form in which this testimony was given. The Michigan authority on the point, while abundant, is confusing.

The first reported cases on the subject need not be reviewed. The principles there embodied, whether right or wrong, were adopted and stated as settled

law by later cases. In *De Haan* v. *Winter,* 258 Mich 293, a malpractice case, a doctor was asked:

"Assuming the facts to be true that I have stated in my hypothetical question, what is your opinion as to the cause, the proximate cause, of the bow in that leg?"

We held that the trial court committed error in overruling the objection to the question, saying (p 300):

"This invaded the province of the jury. As far as the expert could go was to state that the alleged malpractice of defendant might cause the bow in the leg.

"The ultimate issue of fact for determination by the jury was whether malpractice of defendant caused the condition complained of by plaintiff."

Thereafter this rule was reiterated in *DeGroot* v. *Winter,* 261 Mich 660, 671, another malpractice case, where the majority of the Court stated:

"When a result may or may not be occasioned by malpractice, an expert medical witness invades the province of the jury when permitted to go beyond stating that it *could,* and in saying that it *did,* occasion the result. Such an opinion is but the private judgment of the witness and not competent evidence. Whether the alleged malpractice could occasion the result complained of was one of science only. Whether malpractice did occasion such result was in controversy, and, therefore, not one of mere science. When the facts are admitted and not in dispute, the question, if answered, may be considered one of science. But when a result could have been occasioned by 1 of 2 or more causes, the ultimate fact of which cause occasioned the result is for determination by the jury, and a medical expert may not, in the case of conflicting evidence, invade the

province of the jury and testify that the result was in fact occasioned by 1 cause only."

Three members of the Court dissented, saying (p 668):

"We hold that where the connection between the cause and condition is a matter of specialized knowledge not within the information of laymen generally, an expert may express his opinion of the possible, probable, or actual cause of the condition if the testimony be otherwise competent."

Then in *Layton* v. *Cregan & Mallory Co., Inc.*, 265 Mich 574, 580, a negligence case, the Court through Justice Wiest ruled that the admission of the following question was error:

"Is the condition you found during all this time, in your opinion, caused by the injury she sustained in the accident, or by working on the farm?"

The authority used by Justice Wiest was his opinion in *DeGroot* v. *Winter, supra*. This distinction between "could" and "did" was also preserved in *Fontana* v. *Ford Motor Co.*, 278 Mich 199.

However, the distinction has not been preserved inviolate. In *Hull* v. *Detroit United Railway*, 158 Mich 682, a case decided before the *De Haan* and *De Groot Cases*, but after the precedents upon which those cases rely, the Court approved of an instruction to the jury (p 686) based upon medical testimony to the effect that "One physician said in his judgment these injuries were due to an accident received in a streetcar." The apparent basis of the ruling was the existence of conflicting medical testimony as to the cause of plaintiff's condition. In *Van Der Bie* v. *Kools*, 264 Mich 468, defendant cited as error the permission granted a doctor to answer this question:

"*A.* Assuming the treatment of this boy's arm after it was broken to have been set forth in that

hypothetical question, what in your opinion would that treatment result in, what would be the result of that kind of treatment?"

The Court, overruling defendant's contention, stated (pp 471, 472):

"He was not asked what did produce the result. That was for the jury to determine. It was proper for him to testify that certain conditions would, might, or could produce certain results."

Just what the difference is between "would" and "did" the court did not say and the decision in that regard further throws the distinction theretofore made into confusion.

There have been later cases where the question arose. In *Froman* v. *Banquet Barbecue, Inc.*, 284 Mich 44, a doctor said that, "It is my opinion that the cecum became infected due to injury and devitalization of the tissue by the injury." In allowing this testimony the Court stated (p 53):

"Although the doctor did announce his conclusion, he also expressed his opinion that the injury was the cause of the physical condition which he found."

It is equally difficult to rationalize the reasoning given in that case with the *De Haan* and *DeGroot Cases*. Finally the *De Haan* and *DeGroot Cases* were not applied where the testimony was a doctor's opinion concerning the probable effects of the injury which the plaintiff received. In *Pearce* v. *Rodell,* 283 Mich 19, 33, we held:

"The probable effects of an injury such as that suffered by the plaintiff could be shown only by the opinion of a competent physician."

Chronology cannot explain the apparent confusion of authority in this State. This distinction between "could" and "did" has even been criticized in Michi-

gan cases. *People* v. *MacGregor,* 178 Mich 436, 474; *Cord* v. *Pless,* 216 Mich 33, 44; see dissent in *DeGroot* v. *Winter, supra.* Other jurisdictions have questioned and in at least one instance have overruled a prior adherence to it. See 136 ALR 1002. Eminent authority considers it groundless and indefensible. See 7 Wigmore, Evidence (3d ed, 1940), § 1976, p 122. Suggested codes of evidence have not included the distinction in their formulation of a rule regarding expert opinion evidence. American Law Institute, Model Code of Evidence, Rule 401; Uniform Rules of Evidence, Rule 56;* see American Law Institute, Model Code of Evidence, p 349, where one of the committee on evidence of the American Law Institute writes in regard to the rule on expert opinion testimony:

"The emphasis of the model code is placed upon the personal knowledge whereof the witness speaks rather than the kind of language used in expressing his perceptions. The code distinguishes between what a witness may think in the abstract and the attempt of a witness to express what he has in fact perceived through terms of opinion. It is often difficult for the witness to distinguish between fact and opinion, and in many cases, such as in the case of identification of a person, fact and opinion are hardly separable."

The distinction is patently contrary to the view taken by most courts that evidence of a mere "possibility" of a causal connection between the accident and the condition is not sufficient to prove the existence of the relationship and a conclusion thereon is "entirely speculative." *Burton* v. *Holden & Martin Lumber Co.,* 112 Vt 17 (20 A2d 99, 135 ALR 512).

To preserve the distinction is to nullify the value and efficiency of expert testimony. The common law

---

* Handbook of the National Conference of Commissioners on Uniform State Laws, 1953, pp 193, 194.—REPORTER.

originally excluded opinion testimony completely. Later, experts were allowed to give opinions in fields in which laymen were generally ignorant. If an expert can only say "could" and not "did," the very reason for admission of his testimony at all is subverted. The jury is thus left to conclude that it "did." But they are laymen and are in no better position to say that it "did" than they would have been if they were deprived of the testimony altogether and allowed to speculate that it "could."

The province of the jury can still be preserved because they must pass upon the weight of the testimony and the credibility of the witness. If they choose to disbelieve the witness, the fact that he concluded that the accident "did" cause the condition is immaterial. If they choose to believe him, testimony that the accident "could" cause the condition does not help them, and an ultimate conclusion on their part that it "did" is pure speculation. The jury must find that it "did," yet the distinction, if preserved, leaves them without any evidence to that effect. There appears to be no reason to retain and every good reason to abolish the distinction apparently heretofore made in this jurisdiction. Accordingly the admission of the testimony complained of was not error.

It is possible to admit the testimony on a ground other than abolition of the distinction. All cases seem to concede that where all of the evidence points in one direction and there is no conflict in the testimony, a conclusion or opinion on the part of an expert that the accident "did" cause the plaintiff's injury or condition is allowable. *DeGroot* v. *Winter, supra,* at 671; *People* v. *MacGregor, supra.*

The plaintiff testified that some years prior to the accident she had worked on a farm digging post holes and doing other predominantly manual work. It apparently became defendant's theory that these

activities may have caused the spondylolisthesis, for in cross-examining the doctor defense counsel elicited the following:

"It is possible that the repeated small traumas involved in lifting or working can bring about the symptoms without an accident; that is variable, it could occur in the mid-fifties or earlier; had this accident not occurred, it is possible, but I think unlikely that plaintiff would be suffering the symptoms that she now suffers; it is possible, but usually it is preceded with some rather violent trauma, or repeated traumas. The digging of the fence post holes could possibly be the repeated trauma that might create the condition; if that were part of her activity, I am surprised that it hadn't.

"*Q.* Assuming that Mr. Wise hypothetically had included the information that during the summer preceding this accident the patient had engaged in clearing a fence row and helping to dig fence holes and helping to string fence on some 40 rods' length, would that affect your opinion?

"*A.* On the basis of my findings and my history it wouldn't affect the opinion."

No further evidence was offered by defendants, either by way of medical testimony or otherwise, to substantiate their theory that plaintiff's condition might have been caused by other than the accident. As shown above the sole witness on the point, though his testimony was somewhat ambiguous, concluded that his original opinion as to the cause of the injury would not be affected. In view of the record all defendants had was an unsupported theory. See *Kemp* v. *Aldrich,* 286 Mich 715, 720. There being no conflicting evidence as to the cause of plaintiff's condition, the admission of the expert testimony to the effect that the accident "did" cause it was not error.

Other errors complained of do not warrant discussion. The decision of the court below is affirmed, with costs.

SMITH, BOYLES, and KELLY, JJ., concurred with BUTZEL, J.