## McKINNEY *v.* YELAVICH.

1. NEGLIGENCE—DEFINITION.
   Negligence is conduct that fails to measure up to an acceptable standard.

2. SAME—STANDARD OF CONDUCT—QUESTION FOR JURY.
   The standard of conduct employed in determining whether or not a person is guilty of negligence is that of a reasonably prudent man acting under the same or similar circumstances and whether or not the standard has been attained is, normally, a jury question; it being permitted to take a case from the jury only under extreme circumstances where reasonable minds could not differ upon the facts, or the inferences to be drawn therefrom.

3. SAME—FIXED RULES OF BEHAVIOR.
   So long as courts are bound to do justice between parties to an action based on negligent conduct, they can be bound by no fixed rules of behavior, since what may be extreme caution under one set of circumstances may be the essence of recklessness under another.

4. AUTOMOBILES—PEDESTRIANS—6-WAY INTERSECTION—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY—OBSERVATION.
   Whether or not plaintiff pedestrian was guilty of contributory negligence in failing to see defendant's automobile .approach him for at least 110 feet as plaintiff was endeavoring to cross a 6-way street intersection with the traffic light in his favor to the point of collision *held,* a question for the trial court which tried the case without a jury.

DETHMERS, C. J., and CARR, J., dissenting.

REFERENCES FOR POINTS IN HEADNOTES
[1]  38 Am Jur, Negligence § 2.
[2]  38 Am Jur, Negligence §§ 30, 345.

Appeal from Wayne; Edwards (George), J. Submitted January 10, 1958. (Docket No. 37, Calendar No. 47,399.) Decided June 12, 1958.

Case by John McKinney against John Ivan Yelavich for personal injuries sustained when struck by automobile. Judgment for plaintiff. Defendant appeals. Affirmed.

*Ward, Plunkett & Cooney* and *Rosin & Kobel,* for plaintiff.

*Erickson, Dyll, Marentay, Van Alsburg & Slocum,* for defendant.

DETHMERS, C. J. (*dissenting*). This is another case of automobile striking pedestrian crossing a street at an intersection crosswalk. Again the problem is whether plaintiff pedestrian should be held guilty of contributory negligence as a matter of law. The case was tried by the court without a jury, judgment entered for plaintiff, and defendant appeals.

Three streets cross at the intersection, which may be approached from 6 directions. The sets of signal lights controlling traffic there present a somewhat more complex situation than obtains at the ordinary intersection. It is undisputed that plaintiff started crossing one of the streets under protection of a traffic control light which had just begun to display the word "walk" in his favor. He safely crossed the first half of the street, but after entering into the far half was struck by defendant's automobile coming from plaintiff's right. A fair inference from his testimony is that the traffic light had continued in his favor, as above described, up to the time of the collision. The trial court made a finding of fact, however, that plaintiff had proceeded approximately to the middle of the street when the traffic control

light changed and started to operate the warning "don't walk" flasher signal which indicates that a pedestrian may not start to cross but may complete a crossing already begun. If such change in the traffic light occurred as found by the trial court, plaintiff did not notice it, despite the fact that, as he testified, he had continued to watch the light. Although plaintiff testified that he looked to his right 3 times while crossing the street and although, while so crossing, he could plainly have seen defendant's automobile approaching him for at least 110 feet, he did not see it until it was only 4 or 5 feet from him when it was too late to avoid the accident.

Defendant says that at the close of plaintiff's case he moved for judgment of no cause for action on the ground that, even though the version of the testimony most favorable to plaintiff be accepted, namely, that the traffic light was still in his favor when he was struck, still plaintiff was guilty of contributory negligence as a matter of law in not observing defendant's approaching automobile. Defendant further says that on this appeal he has abandoned that position because of the subsequent interment, as defendant styles it, in *Barron* v. *City of Detroit,* 348 Mich 213, of the cases of *Morse* v. *Bishop,* 329 Mich 488, and *Boyd* v. *Maruski,* 321 Mich 71. Defendant urges on appeal, however, that we nevertheless should hold plaintiff guilty of contributory negligence as a matter of law on the basis of the trial court's finding of fact that the traffic light had changed while plaintiff was still in a position of safety, such contributory negligence consisting of plaintiff's failure to note the change in the traffic signal and then to be on the lookout for oncoming traffic and observe defendant's approaching automobile. Defendant cites no authority for, nor are we willing to adopt, a new rule that, in determining

whether a plaintiff was guilty of contributory negligence as a matter of law, we will depart from our long-standing practice (extending at least from *Detroit & Milwaukee R. Co.* v. *Van Steinburg,* 17 Mich 99, to *Ohman* v. *Vandawater,* 347 Mich 112) of viewing the evidence in the light most favorable to plaintiff and, instead, accept as controlling the finding of facts of the trial court.

The reasoning and precedents which support defendant's still-asserted right to a holding that plaintiff was guilty of contributory negligence as a matter of law, but which defendant now reluctantly abandons as already interred, the writer hereof is unwilling to leave to unmourned obsequies in advance of their demise. Interment of *Morse* and *Boyd,* if imminent, has not, heretofore, become a *fait accompli* by action of a majority of this Court insofar as any of its reported opinions discloses. In my view, plaintiff, for failure to maintain a reasonable and proper outlook and seasonably to see defendant's automobile as he easily might have done as it was approaching him at a moderate rate of speed for a distance of 110 feet until it was only 4 or 5 feet from him, should be held guilty of contributory negligence as a matter of law. Reasons for my view are set forth in my opinions in *Barron* and in *Morse,* Mr. Justice North's opinion in *Boyd,* Mr. Justice Carr's opinion in *Ortisi* v. *Oderfer,* 341 Mich 254, Mr. Justice Reid's opinion in *Buehler* v. *Beadia,* 343 Mich 692, and those in *Sloan* v. *Ambrose,* 300 Mich 188; *Long* v. *Garneau,* 319 Mich 291; *Ashley* v. *Kilborn,* 333 Mich 283, and cases cited in them, all of which, as it seems to me, combined to establish the law on the subject in Michigan.

The judgment should be reversed without new trial, and with costs to defendant.

Carr, J., concurred in the result.

Smith, J.   We need no more than summarize the facts, which are fully set forth in my Brother's opinion.   Before us we have an automobile-pedestrian accident at a complex 6-way street intersection. The plaintiff had started his crossing under the protection of a light displaying the word "walk." He was struck before completing his journey.

The case, however, is unusual.   This is not because of its fact situation.   A pedestrian lawfully in the crosswalk, proceeding as authorized by sign erected for his guidance, struck down by an automobile violating the law, is no novelty.   Nor is it new to our legal thinking that he be prevented from recovery against the motorist by the holding of this Court that he was guilty of contributory negligence "as a matter of law."   Our Michigan lawbooks are full of the abortive jump and sprint cases, the situations in which pedestrians encumbered by the frailties of old age, physical infirmity, infancy, obesity, or deficient locomotion, have not moved with sufficient alacrity to avoid the oncoming car.   We examined some of these holdings in the recent case of *Bartlett* v. *Melzo*, 351 Mich 177, to which we again profess our adherence.

The case before us is unusual, however, in the clarity with which is revealed the source of much of our error.   We have tried to substitute specific roles of behavior for a general standard of care. All will agree, of course, that negligence is conduct that fails to measure up to an acceptable standard. The standard now employed by the law is that of a reasonably prudent man acting under the same or similar circumstances.   Whether or not the standard has been attained is, normally, a jury question.*

---

* See, with respect to the jury function in this type of case, "Changing Rules of Liability in Automobile Accident Litigation," Richard M. Nixon, 3 Law and Contemporary Problems, 476.

Only under the most extreme circumstances, those, in fact, where reasonable minds could not differ upon the facts, or the inferences to be drawn therefrom, can the case be taken from the jury. If honest differences of opinion between men of average intelligence might exist, the issue should not be resolved by the court alone.

These truisms have been repeated again and again in the decided cases but their repetition in many cases in the last quarter century has amounted to no more than the rotation of a prayer wheel, since, with monotonous regularity, we have thereupon proceeded to do just what we said should not be done, namely, to take the case from the jury (or, as here, the trier of the facts) on the ground that there was negligence, or contributory negligence, "as a matter of law." The theory upon which this is done demands our present attention. A return to fundamentals is in order.

The attainment, or lack of attainment, of the standard of due care can be predicated only upon the existence of certain facts.

For example, under some circumstances a jury may be permitted to find, under proper instructions, that a failure to "stop, look and listen" before crossing a railroad track amounted to a failure to exercise due care under the circumstances. If this finding is permitted to petrify into a hard and fast "rule" (*i.e.,* that it is negligence *per se* to fail to stop, look and listen under all circumstances before crossing a railroad track), absurd and unjust results will inevitably follow. Thus the Pennsylvania court, which had long adhered to such a rule, held, in the case of *Benner* v. *Philadelphia & Reading R. Co.,* 262 Pa 307 (105 A 283, 2 ALR 759), that it was contributory negligence as a matter of law for a driver to fail to stop before crossing a private railroad siding. But he suffered no harm on this siding. He

was killed on the main line, beyond the siding, and adjacent thereto. Before, however, attempting to cross the main line he had, in fact, stopped and made observation, but he had not seen the fast express that killed him because of a curve in the tracks. Nevertheless, his antecedent failure to stop before crossing the private siding barred his widow's action. The private siding was, after all, "a" track and the rule applies to "any" track. "It is an absolute and unbending rule," held the majority (p 310), "that a traveler upon the public highway must stop, look and listen at a point before he crosses any tracks. * * * [We are asked] (p 311) to make an exception of this case and to say that because Benner was not injured on the first track his failure to stop before crossing it did not produce the accident. This is bending the rule which has been declared to be unbending."

A similar effort directed towards rule-canonization in the supreme court of the United States proved less successful. Mr. Justice Holmes had lent the weight of his prestige to the "rule" that if a plaintiff could not otherwise ascertain the dangerous proximity of a train, he was under a duty to get out of his car and examine the tracks. *Baltimore & Ohio R. Co.* v. *Goodman* (1927), 275 US 66 (48 S Ct 24, 72 L ed 167, 56 ALR 645). The effort was doomed to failure. So long as courts exist to do justice between the parties they can be bound by no fixed rules of behavior. What may be extreme caution under one set of circumstances may be the essence of recklessness under another. As Justice Cardozo pointed out in *Pokora* v. *Wabash R. Co.*, 292 US 98, 104–106 (54 S Ct 580, 78 L ed 1149, 91 ALR 1049):

"Besides being uncommon, it [to get out of a vehicle and reconnoiter] is very likely to be futile, and

sometimes even dangerous. If the driver leaves his vehicle when he nears a cut or curve, he will learn nothing by getting out about the perils that lurk beyond. By the time he regains his seat and sets his car in motion, the hidden train may be upon him. See, *e.g., Torgeson* v. *Missouri-K.-T. R. Co.*, 124 Kan 798, 800, 801 (262 P 564, 55 ALR 1335, 27 NCCA 126); *Dobson* v. *St. Louis, S. F. R. Co.*, 223 Mo App 812 (10 SW2d 528); *Key* v. *Carolina & N. W. R. Co.*, 150 SC 29, 35 (147 SE 625); *Georgia Railroad & Banking Co.* v. *Stanley*, 38 Ga App 773, 778 (145 SE 530). Often the added safeguard will be dubious though the track happens to be straight, as it seems that this one was, at all events as far as the station, about 5 blocks to the north. A train traveling at a speed of 30 miles an hour will cover a quarter of a mile in the space of 30 seconds. It may thus emerge out of obscurity as the driver turns his back to regain the waiting car, and may then descend upon him suddenly when his car is on the track. Instead of helping himself by getting out, he might do better to press forward with all his faculties alert. So a train at a neighboring station, apparently at rest and harmless, may be transformed in a few seconds into an instrument of destruction. At times the course of safety may be different. One can figure to oneself a roadbed so level and unbroken that getting out will be a gain. Even then the balance of advantage depends on many circumstances and can be easily disturbed. * * *

"Illustrations such as these bear witness to the need for caution in framing standards of behavior that amount to rules of law. The need is the more urgent when there is no background of experience out of which the standards have emerged. They are then, not the natural flowerings of behavior in its customary forms, but rules artificially developed, and imposed from without. Extraordinary situations may not wisely or fairly be subjected to tests or regulations that are fitting for the common-place or

normal. In default of the guide of customary conduct, what is suitable for the traveler caught in a mesh where the ordinary safeguards fail him is for the judgment of a jury."

The caveat with which Justice Cardozo closed his opinion has a peculiar applicability to the situation in which the courts and litigants of Michigan now find themselves as a result of our tenacious adherence to "rules" of negligence imported from unlike fact situations. As we said in *Krause* v. *Ryan,* 344 Mich 428, 433, 434:

"Can we cite broadly from one negligence situation to another? We fear not. The field of negligence is too broad. We find within it all kinds and conditions of men, from the surgeon at the operating table to the child at the edge of the highway, measuring with uncertain gaze and rising panic the speed of the oncoming truck against the distance to safety. Both situations, it is true, involve care, and both involve humans, but there the similarity stops. Even in that relatively narrow area of negligence involving moving vehicles, intersections, pedestrians, stop signs, arterial highways and traffic lights we find an infinite variety of problems, each with its peculiar circumstances, its unique considerations of care or the lack thereof. At the moment our problem is the determination of negligence on the high-speed, heavy-volume artery of traffic, known as the expressway, the throughway, or the arterial highway. It has its own peculiar considerations, arising out of its peculiar hazards. It cannot be solved by 'rules' taken from negligence opinions in other fields. The policy behind the construction of the great expressways is not involved in the cases relating to ordinary street intersections (as to which we had a statutory right-of-way for many years and before that a common-law preference). Such cases may guide us, but they cannot control our decision here."

We have elaborated upon the history of the stop, look and listen "rule" because it is characteristic of a host of others. Each has its origin in a justifiable holding in a particular fact situation. By lazy repetition the holding becomes a "rule," entirely divorced from its creative facts. It grows as an excrescence of injustice until its very strength concentrates a court's attention upon it, with, normally, the result seen in the *Pokora Case, supra.* The stop, look and listen rule there examined and rejected had a parallel in our jurisdiction in the "rule" that "a favored driver approaching an intersection who seasonably observes another vehicle approaching it at right angles and then proceeds in reliance on the right-of-way without giving the other vehicle further heed is guilty of contributory negligence as a matter of law equally as if he had not looked at all." (Dissent, *Krause* v. *Ryan,* 344 Mich 428, 439.) This "rule" is no longer applicable in this State with respect to driving on through streets intersected by subordinate roads. Whether the driver on the through highway has attained the proper standard of care is a jury question. Why? Because of the circumstances peculiar to the through highway. "If," we said (p 437):

"the driver on today's arterial highway remains alert to the hazard immediately ahead of him, to his right, to his left, and does not fail to keep constantly in mind the driver crowding him from the rear, he is doing a reasonably good job of driving. Whether or not he should, in addition to these tasks of considerable magnitude, also keep under more or less continuous observation the driver approaching the arterial from some side road is, under our present law, a question for the jury."

So, likewise, in the situation before us. This case is not controlled by rules, if such there be, that a pedestrian "must" keep a traffic light under constant

observation as he crosses the street, that he "must" notice its changes (if it changes), that he "must" see any car which is "plainly there to be seen" (*Long* v. *Garneau,* 319 Mich 291, 299), or that he must conform to any other rigid or unbending rule or group of rules. Why? For the same reason that Mr. Justice Cardozo rejected the stop, look and listen rule in the *Pokora Case, supra,* and that we rejected the constant observation rule in the *Krause Case, supra,* namely, that our problem is not to apply a so-called rule of law but to determine whether or not a standard of care has been reached. The resolution of this question will depend upon the peculiar facts and circumstances in the case before us, not upon some rigid rule of behavior. In *Krause* the peculiar circumstances lay in the hazards of modern traffic flowing on a through way. Here it concerns the hazards of the pedestrian crossing at this particular corner, a complex 6-way street intersection. He must, at one and the same time, as the trial judge, now Mr. Justice Edwards, pointed out, be wary of hazard "from northbound Fenelon traffic making a left turn or southbound Fenelon traffic making a right turn, or eastbound Six Mile traffic making a right turn, or westbound Six Mile making a left turn, which latter source is actually the source from which the trouble did come." This observation of the traffic signal was only one of his manifold duties.

We find repeatedly in our cases the court's observation that the automobile was "plainly there to be seen" and, hence, plaintiff's failure to see it comprised contributory negligence "as a matter of law." This easy and fallacious legal jingle answers exactly nothing. Of course the car is always there to be seen. It is just as visible to the pedestrian as the pedestrian is to its driver. But the question is not what the pedestrian could have seen, as a matter of physical fact, but what he should have seen in the

exercise of due care. These are vastly different propositions. One of the most careful examinations of the problem in recent years is found in the case of *DeRossett* v. *Malone,* 34 Tenn App 451, 470–472 (239 SW2d 366, 375) (court of appeals of Tennessee, western section, certiorari denied by supreme court of Tennessee), wherein it is held:

"It is common knowledge based upon everyday experience that a pedestrian crossing a street, particularly between intersections, does not stare in one direction or the other for the purpose of taking in all the details of a scene. Ordinarily there is neither time nor opportunity for such scrutiny. Such looking as he does necessarily consists of glances in first one direction and then another, depending upon the direction from which traffic is to be expected, as he proceeds across the thoroughfare, and that is what Mrs. Malone says she did. If a glance discloses that a traffic light is against traffic in an area of the street he is about to enter, it cannot be said, we think, that his failure to see a car approaching the light with the signal against it, is so far contrary to the physical facts that it cannot be accepted as evidence; for it reasonably could be found that the concentration of attention on the traffic signal and the apparent assurance of safety furnished by it would excuse a failure to see the approaching vehicle, and especially is this true, where, as here, the traffic light is over the center of the intersection and, as is commonly known, hangs a considerable distance above the top of an automobile.

"It is also a well-known fact that everything within the range of perception of a human being does not register on his consciousness. Thus it is said to be recognized 'that reasonably effective use of the powers of observation may be made, and yet the presence of (an approaching) vehicle not disclosed.' *Goldenberg* v. *Reggio,* 112 NJL 440, 442 (171 A 677, 678); *Puorro* v. *Salerno,* 109 NJL 381 (162 A 527). What does register on the consciousness depends not al-

together but to a substantial degree upon what is in his mind at the time and especially upon what he is looking for upon the particular occasion. When a pedestrian crossing a thoroughfare looks to his right and his left, he does so primarily for the purpose of determining not whether there is a vehicle or vehicles in sight, but whether he can safely cross before the arrival of any vehicle that may be approaching. His attention is not centered so much on the actual physical presence of a vehicle but upon his chances of crossing safely. If he sees that which can reasonably be regarded as an apparent assurance that his passage will not be jeopardized by an approaching automobile, the fact that one or more were actually within the range of his vision may not register on his consciousness at all and he may be excused from giving the situation that concentration of attention whereby details of the scene would be ascertained. In such cases the question is *ordinarily* for a jury; not for the court to determine as a matter of law."

We must guard against confusing general standards of care (*e.g.*, the actions of a reasonably prudent man under the same or similar circumstances) with particular rules of conduct, sometimes called *"specific"* standards (stop, look and listen; always watch the traffic light; keep observing the approaching side-road driver, et cetera). Conduct which is the epitome of care in some specific situations, under those specific circumstances, may be the essence of recklessness in others. It depends upon the balance of the circumstances. See *Bartlett* v. *Melzo*, *supra*, at page 181. Dean Roscoe Pound phrased the matter well in 44 Reports of American Bar Association, 445, 456, when he said:

"Standards are late developments in law. Thus the standards of the Roman law belong to the classical period; the standard of due care in our law of negligence is the work of the nineteenth century, and

the standards of reasonable service and reasonable facilities in our law of public utilities were not understood until the end of the last century. Moreover, nineteenth-century courts distrusted these standards and sought to put them into strait-jackets. Degrees of negligence, attempts to lay down that this or that was negligence 'as a matter of law,' and the 'stop, look and listen' rule bear witness to distrust of standards and desire to subject conduct to fixed detailed rules. But elimination of circumstances in order to get a rule makes the rule impossible as a practical compromise between the interests of the several participants in the infinitely variable situations of human conduct. In framing standards the law seeks neither to generalize by eliminating the circumstances nor to particularize by including them; instead, the law seeks to formulate the general expectation of society as to how individuals will act in the course of their undertakings, and thus to guide the common sense or expert intuition of jury or commission when called on to judge of particular conduct under particular circumstances."

The entire question has been given thoughtful consideration by 2 Harper & James in their treatise on The Law of Torts, particularly chapter 17 thereof.

Here the plaintiff's conduct was a question for the trier of the facts. We find no error. Affirmed, with costs to appellee.

Kelly, Black, Voelker, and Kavanagh, JJ., concurred with Smith, J.

Edwards, J., did not sit.