WALTERS v SARGENT

OPINION OF THE COURT

1. TRIAL—DIRECTED VERDICT.

   The trial court is justified in granting a directed verdict only where reasonable minds could not differ upon the facts or the inferences to be drawn therefrom.

2. APPEAL AND ERROR—COURT OF APPEALS—ORDERS—COURT RULES.

   The Court of Appeals is empowered to make any order or judgment which ought to have been made or entered by the trial court (GCR 1963, 820.1[7]).

3. NEGLIGENCE—COMMON ACTIVITY—HUNTING ACCIDENT—DIRECTED VERDICT.

   The trial court properly granted a directed verdict for defendants where the plaintiffs alleged that defendants were jointly engaged in a negligent operation of hunting deer, but where the trial record, viewed in the light most favorable to the plaintiffs, indicated that defendants' mode of hunting was common, and did not disclose any concerted activity on the part of all the defendants which would in any way prove that the mode of operation of the deer hunt was conducted in a negligent or careless manner.

4. PLEADING—AMENDED COMPLAINT—COURT RULES—NEGLIGENCE.

   Plaintiffs should be allowed to amend their complaint to conform to their proofs concerning the individual liability of a defendant where the original complaint sounded against several defendants praying for a joint and several judgment for damages sustained in a hunting accident, but where the facts disclosed

REFERENCES FOR POINTS IN HEADNOTES
[1, 7] 53 Am Jur, Trial § 332.
[2] 5 Am Jur 2d, Appeal and Error §§ 238, 239.
[3] 58 Am Jur 2d, Negligence §§ 7, 9.
[4] 52 Am Jur, Torts § 110 *et seq.;* 61 Am Jur 2d, Pleadings §§ 99–115.
[5] 58 Am Jur 2d, Negligence §§ 136, 137.
[6] 58 Am Jur 2d, Negligence §§ 458–461.
[8] 58 Am Jur 2d, Negligence §§ 6–9.

that one of the defendants had admittedly fired his rifle in the vicinity of the accident (GCR 1963, 118.3).

5. NEGLIGENCE—PROXIMATE CAUSE—QUESTION OF FACT.

It was a question for the jury whether gunshot injuries were proximately caused by a defendant who had admittedly fired his rifle in the vicinity of an accident, and the trial court erred in granting a directed verdict against plaintiffs in favor of that defendant.

CONCURRENCE IN PART, DISSENT IN PART BY HOLBROOK, J.

6. NEGLIGENCE—JOINT VENTURE—LIABILITY OF PARTICIPANTS.

*Joint activity, if conducted in a negligent manner or under conditions which might be dangerous to persons in the vicinity, constitutes a violation of the common duty to do no negligent act toward others, and all engaged in the joint activity are liable for the negligent act of one of them which injures any person.*

7. TRIAL—DIRECTED VERDICT.

*A directed verdict is improper if there is any evidence tending to prove the nonmoving party's contention on the question involved.*

8. NEGLIGENCE—JOINT ACTIVITY—HUNTING ACCIDENT—QUESTION OF FACT.

*It was a question of fact whether a "deer run" was conducted in a negligent manner by defendant hunters where testimony indicated that it was snowing at the time, that it was dusk or getting dark, that the area up to the road upon which the plaintiff was injured was very dense with pine trees, that those attempting to flush the deer were in heavy, dense foliage, brush, and pine trees, that one of the defendants fired a warning shot from the hip, and that other members of the joint venture were on the road where apparently the only open area was present.*

Appeal from Kent, John H. Vander Wal, J. Submitted Division 3 November 8, 1972, at Grand Rapids. (Docket No. 13054.) Decided April 24, 1973. Affirmed as to Sargent and reversed as to other defendants with instructions, 390 Mich 775.

Complaint by Jewell Walters, Sr., for himself and as next friend of Jewell Walters, Jr., against James J. Sargent and others for damages resulting

from a hunting accident. Directed verdict for defendants. Plaintiffs appeal. Affirmed in part, reversed in part, and remanded for further proceedings.

*Louis John Educato,* for plaintiffs.

*Joel S. Whetstone,* for defendant James J. Sargent.

*Hillman, Baxter & Hammond* (by *William S. Farr),* for defendants Walter E. Dyer and Jake Sargent.

*Harry Lieffers, Jr.,* for defendant Jerry Reminga.

*Smith, Haughey, Rice, Roegge & Gould,* for defendant Orville Waddell.

*Cholette, Perkins & Buchanan* (by *Bruce M. Bieneman),* for defendant Ward Keppel.

Before: R. B. BURNS, P. J., and HOLBROOK and DANHOF, JJ.

DANHOF, J. *(affirming in part and reversing in part).* On November 20, 1969, the defendants met and agreed to hunt deer in a triangular area designated by boundaries of Merrillville Road, running north and south, 11-Mile Road, running east and west, and an electric power line which ran northeasterly just west of Merrillville Road in Eaton Township, Lake County, Michigan. Sometime after 4 p.m. they engaged in a deer run[1] in this area. Defendant, James Jay Sargent, a partici-

---

[1] "That is where you get a few guys lined up on one site and four or five guys drive this way, to get a deer out so the other guys can get a shot at it." Testimony of James Jay Sargent (p 194, Tr).

pant in the deer run, was walking towards Merrill-ville Road. He saw a deer in front of him and fired a warning shot so that the other members of the hunting party would know that a deer was coming in their direction.

At about the same time, defendant, James Jay Sargent, fired his rifle, plaintiff, Jewell Walters, Jr., and two companions were proceeding in an automobile south on Merrillville Road. Plaintiff, Jewell Walters, Jr., was seated in the middle of the front seat in between his two companions. As the vehicle was proceeding on Merrillville Road, he was struck by a bullet in the right shoulder. The bullet was never found.

Plaintiffs filed suit against all of the defendants on August 17, 1970, alleging that the injuries to the plaintiff were the result of all the defendants being jointly negligent. A jury trial commenced on November 1, 1971. After plaintiffs rested, defendants moved for a directed verdict which was granted by the trial court.

The basis for the granting of the directed verdict by the trial court was that the uncontroverted facts, both physical and circumstantial, indicated that the bullet that the defendant, James Jay Sargent, fired could not have possibly been the bullet that struck the plaintiff, Jewell Walters, Jr. Thus, the court ruled that because the firing of the bullet by defendant, James Jay Sargent, could not have been the proximate cause of the injury to the plaintiff, none of the defendants could be liable as being jointly negligent. Therefore, the only issue here on appeal is whether or not the trial court erred in granting the directed verdict for the defendants.

When the trial court directs a verdict in favor of the defendant at the conclusion of the plaintiff's

proofs we must view the facts in the light most favorable to the plaintiff. The trial court is justified in granting a directed verdict in such instances only where reasonable minds could not differ upon the facts or the inferences to be drawn therefrom. *McKinney v Yelavich,* 352 Mich 687 (1958); *Ackerberg v Muskegon Osteopathic Hospital,* 366 Mich 596 (1962).

While the trial court granted the directed verdict upon the basis that the bullet fired by the defendant, James Jay Sargent, could not possibly have been the one that struck plaintiff, Walters, we are not bound solely to this determination, since this Court is empowered to make any order or judgment which ought to have been made or entered by the trial court. GCR 1963, 820.1(7).

Examination of the complaint in the instant case discloses that the plaintiffs alleged that the defendants were jointly engaged in a negligent operation of hunting deer. As such, a valid cause of action was alleged against said defendants. See *McCoy v DeLiefde,* 376 Mich 198 (1965). However, as was stated in *McCoy,* p 208:

"Whether, upon trial, plaintiff can prove facts to support his allegations is, of course, a question the determination of which must await that event."

Examination of the record in this case indicates, even viewing the facts in a light most favorable to the plaintiffs, that plaintiffs have failed to establish that the mode of hunting was either negligent or recklessly conducted. Quite to the contrary, even the companions of plaintiff, Jewell Walters, Jr., testified that this was a common mode of hunting, and the record does not disclose any concerted activity on the part of all the defendants which would in any way prove that the mode or

operation of the deer hunt was conducted in a negligent or careless manner. Thus, we conclude that the trial court was correct in granting a verdict for the defendants insofar as it relates to the allegation of a negligently conducted hunting operation.

While the plaintiffs' complaint sounded against the defendants jointly they pray for a joint and several judgment. We conclude that since the facts disclose that defendant, James Jay Sargent, did admittedly fire his rifle the plaintiffs should be allowed to amend their complaint to conform to such proofs as it concerns the individual liability of defendant, James Jay Sargent. GCR 1963, 118.3.

Thus, insofar as whether the injuries to the plaintiffs were proximately caused by the negligence of defendant, James Jay Sargent, is a question of fact to be determined by the jury.

Reversed and remanded for further proceedings not inconsistent with this opinion. No costs, neither party having prevailed in full.

R. B. BURNS, P. J., concurred.

HOLBROOK, J. *(concurring in part, dissenting in part).* This writer is in accord with the majority opinion ‘insofar as it determines that plaintiffs presented sufficient evidence as to the possible liability of defendant James Jay Sargent requiring the court to submit that question to the jury. Difficulty arises in reaching an accord with the finding that "even viewing the facts in a light most favorable to the plaintiffs, that plaintiffs have failed to establish that the mode of hunting was either negligent or recklessly conducted". It is true that plaintiff Jewell Walters, Jr., testified that this was a common mode of hunting, that he had participated in such a mode of conduct, and that it

was a safe way to hunt. However, the plaintiff did not say nor was he apprised of all the facts in the case concerning whether or not this particular deer run was conducted in a negligent manner.

The case of *McCoy v DeLiefde,* 376 Mich 198 (1965) gives us guidelines to follow in determining whether several persons acting in concert in a common activity are liable for the negligent act of one of them which injures a person. The rule appears to be that such common or joint activity, if conducted in a negligent manner or under conditions which might be dangerous to persons in the vicinity, constitutes a violation of the common duty that they owe to do no negligent act toward others. Under such circumstances all are liable for the negligent act of one of them which injures any person. This is illustrated very well at pages 207–208 as follows:

"This is demonstrated by *Gaufin v Valind,* 268 Mich 269 (1934). There, defendants appealed from a jury verdict awarding damages to plaintiff for injuries she sustained when she was struck by a can thrown from a truck during a parade. Defendants were a wholesale grocer and Valind, a representative of a canning company. Employees of the grocer and Valind had decorated the truck, had driven it in the parade, and had thrown cans therefrom for advertising purposes. No reference to any statutory violation was made, and the Court approved this jury instruction, and others:

" 'If two persons act in concert or with a common design or purpose, and one of them commits a negligent act by which a third person is injured without fault or negligence on the part of the third person, then the two so acting in concert are joint wrongdoers and both are liable for the injury, so done, because both owed the common duty to the injured person to do no negligent act towards him.' 268 Mich 269, 272.

"Whether, upon trial, plaintiff can prove facts to support his allegations is, of course, a question the

determination of which must await that event. Plaintiff did succeed in *Gaufin:*

"'The evidence was sufficient to justify a finding of community of interest in the display as made and the manner in which it was sought to be made effective, and warranted the instruction as given.' 268 Mich 269, 273."

This rule of law was made directly applicable to a group of three defendants who were liable having acted in concert to hunt pheasants in a field where corn was so high and thick to make it difficult to know if another hunter was in the line of fire.

Judges Danhof and R. B. Burns state in their opinion that plaintiffs charge in their complaint that all the defendants were jointly negligent. This writer agrees.

In such a case as this where the trial court grants a directed verdict in favor of defendants, we must view the evidence presented in a most favorable light to the nonmoving party. A directed verdict is improper if there is any evidence tending to prove plaintiffs' contention on the question involved. *Wadsworth v New York Life Ins Co,* 349 Mich 240 (1957); *Manuel v Weitzman,* 23 Mich App 96 (1970); *Sparks v Luplow,* 372 Mich 198 (1963).

What is the evidence in the instant case that bears upon the joint endeavor or venture being accomplished in a negligent manner or under conditions that make such joint venture dangerous?

David Eugene Heltz and William R. France, the investigating State Police officers, who were present at the scene shortly after the incident testified in part as follows:

*"Q. [Mr. Educato, plaintiffs' attorney]:* Mr. James Sargent?

"*A. [Mr. Heltz]:* Yes.

"*Q.* And what, if any, conversation did you have with him?

"*A.* Well, we asked him if he had taken a shot, or something to this, if he had shot,—he said yes. He didn't know how close he was to the road, he took a shot, he pulled his weapon up and shot from the hip,— shot from the hip.

"*Q.* From the hip?

"*A.* From the hip.

"*Q.* And what, if anything else did he say then after he stated that?

"*A.* He said he saw the deer and then shot from the hip, and he said he was warning the other hunters that there was a deer coming.

"*Q.* Did he say what direction he was moving when he did this shooting?

"*A.* They were moving towards Merrillville Road.

\*   \*   \*

"*Q.* Are you familiar with the area that this accident occurred?

"*A.* No, that was the first and only time I have ever been there.

"*Q.* What type of foliage or terrain is it there, if you know?

"*A.* Well when we looked over to each side that night, it was very dense, very heavy pine trees, lot of snow,— not too much snow.

\*   \*   \*

"*Q. [Mr. Educato]:* What was the conversation with Mr. Sargent at the cabin?

"*A. [Mr. France]:* Well as I recall, Mr. Sargent, advised again that they were hunting, it would be west of this Merrillville Road, he saw a deer, he was in a position where apparently the deer was supposed to be crossing him through this drive, and he did see a deer go by, and he pulled up his rifle and shot from the hip. As I recall, the deer—his statement as he gave it to us, to the best of my knowledge, that the deer passed between him and Merrillville Road, between his location where he was.

"*Q.* Did you have any other conversation with James Sargent?

"*A.* None other that I can remember. He seemed quite shook up at the time and was—rather not too well composed. We merely asked him questions about what happened, what he did, what went on and so forth at this time of the shooting.

"*Q.* What type of an area is this, regarding the terrain?

"*A.* As I recall it is pine trees and I think there was quite a lot of under-brush or brushy area in there with the pines. I am not sure, but as I recall there was small stuff in there too, bushes.

\* \* \*

"*Q. [Mr. Roegge, defendant Waddell's attorney]:* To say exactly what that area was like it would be a little difficult to say whether it had jack-pines or underbrush wouldn't it?

"*A. [Mr. France]:* As I recall I was looking around the area off of the road in both directions.

"*Q.* With a light.

"*A.* Yes, and like I say, this is again from memory, entire Lake County, that area is quite full of pines and so forth.

"*Q.* At least along the road it would be quite dense?

"*A.* Yes.

"*Q.* It would be difficult for a bullet to get through that area?

"*A.* I wouldn't say that. It would be very dense as far as bushes and limbs and so forth."

Terrance W. Bouwman, one of the three persons in the automobile when the plaintiff was injured, testified in part as follows:

"*Q. [Mr. Educato]:* Now as you made a turn, a left turn on Eleven Mile Road what if anything did you see?

"*A.* I seen three or four hunters on my left hand side standing in the gutter of the road there.

"*Q.* Were they all together or what was the placement of them?

"*A.* Well they were standing in a line, separated about 20 to 25 yards apart.

"*Q.* What side of the road, did you say these hunters were on?

"*A.* The east side.

"*Q. They were over here on the ease side?*

"*A.* Right.

"*Q.* You say they were about 20–25 yards apart?

"*A.* Yes.

"*Q.* Did you take a good look at them?

"*A.* I just talked to one a little bit.

"*Q.* You talked to one?

"*A.* Yes. As I turned the corner we stopped for a brief second, asked if they had got anything, and they answered no.

"*Q.* Did you get anything that day?

"*A.* No, we did not.

"*Q.* Was there anyone else with that one hunter that you talked to?

"*A.* Three or four gentlemen.

"*Q.* I mean were they together or was this—

"*A.* They were standing apart.

\* \* \*

"*Q.* Did this person have a gun in his hands?

"*A.* Yes.

"*Q.* How was he holding the gun?

"*A.* Just standing there, holding it like this, looking ahead.

"*Q.* Did you see any other persons with guns in their hands on that road?

"*A.* Yes, all the way down standing along that road and they were holding a gun in some manner.

"*Q.* What if anything was the next thing you can recall as you were traveling south on Merrillville Road?

"*A.* Well, after we asked how they were doing, we drove on, and it seemed like an explosion and the window blew out, and then something hit me on the side of the face, and I let go of the wheel, car went up on the bank.

"*Q.* You indicated on the right side of your face?

"*A.* Yes.

"*Q.* You indicated an explosion?

"*A.* Yes.

"*Q.* What side of the car did you hear the explosion on?

"*A.* On the right hand side.

\* \* \*

"*Q.* Did anyone else then later come to the scene?

"*A.* Yes, I couldn't recall exactly what kind of a car it was, a Ford or something drove up, a man got out.

"*Q.* Can you identify that man today?

"*A.* By looks I wouldn't know, I just could identify him as Sargent.

"*Q.* Which Sargent?

"*A.* Junior, the younger one.

"*Q.* What happened then? He drove up in a car?

"*A.* He drove up in a car, I was standing there, and he got out he was crying, pounding on his car, and said —he shot three boys."

Daniel Lee Fields, one of the passengers in the automobile in which plaintiff was injured, testified in part as follows:

"*Q.* [*Mr. Lieffers, defendant Reminga's attorney*]: Now these people that you saw facing west, now were they on this side of the street?

"*A.* Yep—yes, sir.

"*Q.* So they were over here, and they were facing west?

"*A.* Right.

"*Q.* Now did you have any notion as to why they would be looking west?

"*A.* Usually when you see hunters standing on the side of the road, there is a deer drive, they are driving the deer out to the men that are standing on the road.

"*Q.* Well, if they are driving deer, would it be your opinion that they were driving the deer, with these fellows looking west, that they were driving the deer from here—from east to west?

"*A.* No.

"*Q.* Oh they are driving west to east?

"*A.* Right.

"*Q.* And they are standing across the road looking west?

"*A.* Right

"*Q.* And I take it, that when you talk about driving deer, you are talking about people that are walking through the thick brush to get the deer out of there so somebody could have a target of opportunity, is that right?

"*A.* Right.

\* \* \*

"*Q.* Did you see these people on the road actually that they were visible from the car?

"*A.* Oh yes.

"*Q.* Were they walking on the road?

"*A.* No.

"*Q.* Are you sure of that?

"*A.* Yes.

\* \* \*

"*Q.* What was the condition—was it getting dusk or hard to see?

"*A.* It was getting dusk.

"*Q.* It was getting to the time not only to quit hunting, but it was that time when nobody could see?

"*A.* You could see, but you could tell it was time to quit hunting.

"*Q.* Did you have your headlights on?

"*A.* I don't remember."

The plaintiff Jewell Walters, Jr., testified that after he was injured he got out of the car and "was laying on the ground and it was snowing out".

This testimony indicates that it was snowing at the time; that it was dusk or getting dark; that the area up to the road was very dense with very heavy pine trees; that the foilage was thick and

that there was heavy brush; that those that were attempting to flush the deer were in this heavy dense foilage, brush, and pine trees; and that one of the defendants, James Jay Sargent, fired a warning shot from the hip; that other members of the joint venture were on the road where apparently the only open area was present.

This writer believes that there was sufficient testimony presented to bring into issue the question of fact as to whether the deer run in question was conducted in a negligent manner. *McCoy v DeLiefde, supra; Gaufin v Valind, supra.*