*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JEFF PAYNE,

        Plaintiff-Appellant,

v

DAVID PAYNE,

        Defendant-Appellee.

FOR PUBLICATION
July 29, 2021
9:20 a.m.

No. 354057
Alpena Circuit Court
LC No. 2016-007043-NI

Before: MARKEY, P.J., and M. J. KELLY and SWARTZLE, JJ.

SWARTZLE, J.

Hunting injuries are not new to the courts of Michigan. Hunting has a long, rich tradition in the state, but as with any sport or recreational activity, injuries will happen, sometimes with devastating consequences. To encourage participation in sports and recreational activities and provide certainty in the law, our Supreme Court adopted a framework governing the standard of care that a participant owes to a coparticipant. Where a risk of injury is inherent to the sport or recreational activity, the standard of care is reckless misconduct; where a risk is not inherent, the standard of care is ordinary negligence.

In this case, we conclude that there remains a question of fact on whether there was an inherent risk that a hunter would be shot by a fellow hunter in the same blind during a European-style pheasant hunt. Accordingly, we affirm in part and reverse in part, and we remand the matter back to the trial court for further proceedings.

## I. BACKGROUND

*European-Style Pheasant Hunt.* Defendant is plaintiff's father. According to plaintiff, both he and his father are active, experienced outdoorsmen. The two frequently hunt together, approximately 20 times a year.

In the fall of 2015, the two men participated in a European-style pheasant hunt (sometimes called a "pheasant shoot"). This type of hunt involves several two-person blinds arranged in a circle around a tower from which pheasants are released into the air. Each blind is approximately four feet front to back and eight feet in width. A blind is designed to accommodate two hunters,

-1-

standing side-by-side. The following diagram and photograph were included in the trial-court record to illustrate the layout of the hunt:

 

Once the hunters are in their respective blinds, a horn signals, pheasants are released from the tower, and hunters shoot at the wildfowl. After a set time limit, a second horn signals, the hunters cease fire, and they rotate to another blind.

Before beginning the hunt, the organizer instructed the hunters on the applicable rules. These included: (1) no shooting while walking from blind to blind; (2) no shooting until the horn sounds; (3) stop shooting when the horn sounds a second time; (4) no loading of shotguns until arriving at a blind; (5) hunters must wear "hunter orange" clothing; (6) no shooting directly to the left or right; and (7) no low shooting—a hunter must see sky around the pheasant before shooting at it.

According to plaintiff, his father did not have any problems handling his shotgun during the first circuit around the tower. Weather conditions were good, and the ground was not slippery. At some point during the second circuit, plaintiff and defendant were standing next to each other in a blind; plaintiff was to the left of defendant as the two faced the tower. When the first horn sounded, the men raised their shotguns to shoot at a pheasant that was heading toward them at "12 o'clock." Plaintiff took just a single shot because, by the time he tracked the pheasant, the bird was directly above him, and he believed that it would not be safe to take a second shot. Defendant took three shots at the pheasant, but did not hit the bird. After the third shot, defendant lowered his shotgun; he did not engage the safety or take his finger off the trigger. Defendant's shotgun suddenly discharged, and the birdshot struck plaintiff's hand, resulting in the loss of two of plaintiff's fingers.

*The Lawsuit*. Plaintiff sued defendant, alleging ordinary negligence, gross negligence, and reckless misconduct. Defendant answered, denying many of plaintiff's allegations and asserting that plaintiff's ordinary-negligence claim was barred by the standard-of-care framework set forth in *Ritchie-Gamester v Berkley*, 461 Mich 73; 597 NW2d 517 (1999).

During discovery, a key issue explored by the parties was defendant's state of mind and physical condition during the pheasant hunt. Defendant testified during his deposition that he has hunted for decades, and he knows the basic safety rules of hunting and firearms. On the day of

the hunt, he had forgotten his regular hunting gloves, and instead he had to use thicker gloves that had less "feel" to them. Defendant testified that he suffers from Raynaud syndrome, a condition that causes temporary discoloration, tingling, and numbness in his hands, and he further has difficulty gripping with his right hand because of a partially missing middle finger. Defendant admitted that, when his shotgun discharged and the birdshot hit his son's hand, his shotgun was not pointed in a safe direction, his finger should not have been on the trigger, and he did not have control of the firearm, all of which violated the basic hunting and firearm safety rules.

For his part, plaintiff admitted during his deposition that, over the years, he would sometimes be concerned about how defendant handled his firearm. Defendant would, for example, occasionally swing his firearm in such a way that the muzzle would cross plaintiff's body. This might happen when defendant entered or exited a vehicle or at the shooting range, but not out in the field, according to plaintiff.

Both parties moved for summary disposition under MCR 2.116(C)(10). Defendant argued that *Ritchie-Gamester* limited his liability to injuries caused by reckless misconduct and the record was clear that he did not act recklessly. Plaintiff argued to the contrary that there was no genuine issue of material fact that defendant had breached the standard of care for an ordinary-negligence claim.

The trial court denied both motions. With respect to the applicable standard of care, the trial court held that the pheasant hunt fell within the scope of recreational activities contemplated by *Ritchie-Gamester*, and, as a result, defendant's conduct was measured by the standard of recklessness, not ordinary negligence. The trial court further concluded that reasonable minds could differ on whether defendant's conduct amounted to reckless misconduct.

*First Application for Leave to Appeal.* Plaintiff filed a delayed application for leave to appeal from the trial court's ruling, arguing that the trial court erred in finding that the pheasant hunt was within the scope of *Ritchie-Gamester*. This Court denied plaintiff's application "for failure to persuade the Court of the need for immediate appellate review." *Payne v Payne*, unpublished order of the Court of Appeals, entered March 10, 2017 (Docket No. 335952). Plaintiff then sought leave to appeal to our Supreme Court, which also denied leave to appeal. *Payne v Payne*, 501 Mich 863; 900 NW2d 648 (2017).

After plaintiff's unsuccessful appeal, the trial court entered a stipulated order staying proceedings, pending the Supreme Court's decision in *Bertin v Mann*, 502 Mich 603; 918 NW2d 707 (2018). After the Court decided *Bertin*, plaintiff moved for relief from judgment, arguing that the trial court's denial of summary disposition essentially dismissed plaintiff's ordinary-negligence claim and that its ruling should be reversed under *Bertin*.

The trial court denied plaintiff's motion, stating that it was "not persuaded that extraordinary circumstances exist that would require setting aside the judgment to achieve justice." The trial court recognized the distinction made in *Bertin* "that coparticipants in a recreational activity owe each other a duty not to act recklessly, but that the standard only applies to injuries that arise from risk inherent to the activity." Analyzing plaintiff's claim under *Bertin*, the trial court concluded:

In this European Shoot, 18 two-person shooting blinds were situated in a circle. Pheasants were then released from a central point to be shot. A horn signaled shooters to cease firing and rotate to the next blind. At some point, defendant fired his shotgun at a pheasant. As he lowered his gun, it discharged, and plaintiff was shot in the left hand. A reasonable person would have foreseen this inherent risk while participating in such an activity.

*Second Application for Leave to Appeal*. Plaintiff filed a second delayed application for leave to appeal, arguing that *Ritchie-Gamester* did not apply to his claim. This Court denied the second application, *Payne v Payne*, unpublished order of the Court of Appeals, entered May 8, 2019 (Docket No. 346694), as did the Supreme Court, *Payne v Payne*, 505 Mich 974; 937 NW2d 653 (2020).

Back in the trial court, defendant filed a renewed motion for summary disposition, arguing that there was not sufficient evidence to show that he acted recklessly. The trial court denied the motion, explaining:

> Although all the testimony indicates that the gun discharged suddenly and accidentally, this same testimony could support a finding of reckless misconduct. There is evidence that defendant wore thick gloves, kept his finger on the trigger without being ready to shoot, and pointed his loaded gun directly at the plaintiff's hand. Reasonable minds could differ as to whether this amounted to reckless misconduct. Accordingly this question should go to a jury.

After denying defendant's motion, the trial court entered a consent order that dismissed plaintiff's "gross negligence claim with prejudice, which will free [p]laintiff to pursue an appeal challenging the [c]ourt's dismissal of his ordinary negligence claim."

## II. ANALYSIS

On appeal, plaintiff argues that the trial court erred by holding that (a) the European-style pheasant hunt was a recreational activity under *Ritchie-Gamester*, and (b) plaintiff's injury was a reasonably foreseeable risk of the pheasant hunt, which subjected plaintiff's claim to a reckless-misconduct standard of care. For the following reasons, we reject plaintiff's first claim but conclude that there is a genuine issue of material fact on the second one.

## A. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition under MCR 2.116(C)(10). *Ritchie-Gamester*, 461 Mich at 76-77. When deciding a motion for summary disposition under MCR 2.116(C)(10), we consider the evidence submitted in a light most favorable to the nonmoving party. *Id*. at 75. Summary disposition is appropriate when "there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

## B. RECREATIONAL ACTIVITY

Plaintiff first argues that the trial court erred in concluding that a European-style pheasant hunt is a recreational activity subject to the framework first set forth by our Supreme Court in *Ritchie-Gamester* and subsequently developed by the Court in *Bertin*. Plaintiff concedes that hunting is, broadly speaking, a recreational activity, but he argues that our Supreme Court did not intend to subject hunting to the *Ritchie-Gamester*/*Bertin* framework. We begin by analyzing the framework generally, and then take up the question of hunting specifically.

*The* Ritchie-Gamester *Court Adopts the Reckless-Misconduct Standard.* Under the common law of tort, many interpersonal interactions are governed by the ordinary negligence standard of care. If the common law provides that a person owes a duty to another person, then that duty is usually to exercise ordinary care commensurate with the particular circumstances of the situation. Up through the 1970s and 1980s, courts of this state imposed an ordinary-negligence standard on hunters when they interacted with members of their own hunting party, *Nagy v McEachern*, 28 Mich App 439; 184 NW2d 556 (1970), members of another hunting party, *Clark v Braham*, 386 Mich 53; 191 NW2d 352 (1971), and non-hunters generally, *Walters v Sargent*, 46 Mich App 379; 208 NW2d 207 (1973), aff'd in part, rev'd in part, 390 Mich 775 (1973). But in 1999, our Supreme Court pivoted away from the ordinary-negligence standard in a narrow category of cases—those cases involving coparticipants who are engaged in a sport or recreational activity.

In *Ritchie-Gamester*, an ice skater collided with another skater. The plaintiff asked the Court to apply the standard of ordinary negligence to her common-law claim, while the defendant argued that a reckless-misconduct standard should apply. *Ritchie-Gamester*, 461 Mich at 75-76.

The Court started its analysis by reviewing the then-current state of the common law for sports and recreational activities. *Id.* at 77-85. The first and second published opinions it analyzed involved parties who were fishing and duck hunting, respectively. *Id.* at 77-78 (discussing *Williams v Wood*, 260 Mich 322; 244 NW 490 (1932) (fishing), and *Felgner v Anderson*, 375 Mich 23; 133 NW2d 136 (1965) (duck hunting)). In both of the earlier cases, the courts applied the standard of ordinary negligence to the plaintiffs' claims, and in *Felgner*, the assumption-of-risk doctrine was abolished in cases involving sports and recreational activities. *Id.* at 78.

The Court then observed that, post-*Felgner*, courts of this state "began to move away from the 'ordinary care' standard" in sports and recreational-activity cases. *Id.* This movement reflected the presumption that coparticipants in a sport or recreational activity voluntarily consent to the risk of injury inherent in that activity, and in the absence of the assumption-of-risk doctrine, the standard itself needed to adjust to reflect this presumption. The movement was uneven, however, as some courts continued to apply a straight ordinary-negligence standard, see, e.g., *Schmidt v Youngs*, 215 Mich App 222; 544 NW2d 743 (1996), while others applied less-stringent standards of various description, see, e.g., *Higgins v Pfeiffer*, 215 Mich App 423; 546 NW2d 645 (1996).

Looking outside of Michigan, the Supreme Court observed that other jurisdictions were basically split into two camps. A minority of jurisdictions applied an ordinary-negligence standard, while a majority of jurisdictions applied "a 'reckless or intentional conduct' or a 'willful and wanton or intentional misconduct' standard." *Ritchie-Gamester*, 461 Mich at 81-82. For those

courts that applied a less-stringent standard, some justified the standard on the risk assumed or consented to by coparticipants, and almost every court "recognized that a fear of litigation could alter the nature of recreational activities and sports." *Id.* at 84. As the Court observed, "Fear of civil liability stemming from negligent acts occurring in an athletic event could curtail the proper fervor with which the game should be played and discourage individual participation." *Id.* (cleaned up).

With this background in mind, the Court took as a basic premise that "[w]hen people engage in a recreational activity, they have voluntarily subjected themselves to certain risks inherent in that activity. When one of those risks results in injury, the participant has no ground for complaint." *Id.* at 87. In light of this understanding, the Court joined the majority of other jurisdictions in adopting "reckless misconduct as the minimum standard of care for coparticipants in recreational activities." *Id.* at 89.

The adoption of the reckless-misconduct standard did not mean, however, that ordinary negligence had no place in recreational activities. The Supreme Court made clear that the reckless-misconduct standard applied only to risks that were inherent in the recreational activity, not those risks that exceeded "the normal bounds" of the activity. *Id.* at 94. Moreover, the reckless-misconduct standard applied only in the context where one participant injured another coparticipant, not where a participant injured a nonparticipant. In footnote 9 of its opinion, the Court explained that its holding was both broad and narrow: "We recognize that we have stated this standard broadly as applying to all 'recreational activities.' However, the precise scope of this rule is best established by allowing it to emerge on a case-by-case basis, so that we might carefully consider the application of the recklessness standard in various factual contexts." *Id.* at 89, n 9.

*The* Bertin *Court Clarifies How to Identify an "Inherent" Risk*. Two decades later, the Supreme Court considered a question that had come up repeatedly in sports and recreation lawsuits after *Ritchie-Gamester*, namely, how to identify whether a particular risk was "inherent" to a particular activity. In *Bertin*, the parties had been golfing, and the defendant hit the plaintiff with a golf cart. *Bertin*, 502 Mich at 606-607. The Court had to resolve whether the risk of being hit by a golf cart during a round of golf was an inherent risk of the sport. *Id.* at 605. If so, then the defendant "owed a duty only to refrain from reckless misconduct," but if not, then the defendant would "be held to the negligence standard of conduct." *Id.* at 605-606.

The *Bertin* Court concluded that the issue came down to one of foreseeability. Specifically, the Court held "that 'inherent risks' under *Ritchie-Gamester* are those that are reasonably foreseeable under the circumstances of the case. When an injury arises from such a risk, the reckless-misconduct standard applies." *Id.* at 622. In determining whether a risk is reasonably foreseeable, the Court stressed several aspects. First, "[t]he foreseeability of the risk is a question of fact." *Id.* at 619. Second, "it is the risk of harm that must be reasonably foreseeable," not just the foreseeability of a particular use or act within the recreational activity. *Id.* at 620. Third, the test is an objective one, and it "focuses on what risks a reasonable participant, under the circumstances, would have foreseen." *Id.* Fourth, "[t]he risk must be defined by the factual circumstances of the case—it is not enough that the participant could foresee being injured in general; the participant must have been able to foresee that the injury could arise through the 'mechanism' it resulted from." *Id.* at 620-621. And fifth, the Court identified several factual circumstances that could be relevant, including: (a) "the general characteristics of the participants,

such as their relationship to each other and to the activity and their experience with the sport"; (b) "[t]he general rules of the activity"; (c) "any regular departures from the rules or other practices not accounted for by the rules"; and (d) "any regulations prescribed by the venue at which the activity is taking place." *Id.* at 621-622. As the Court summarized, courts should apply "the usual approach to reasonable foreseeability" when determining whether a risk is inherent to a sport or recreational activity. *Id.* at 622.

*Does the* Ritchie-Gamester/Bertin *Framework Apply to Hunting?* Given this framework, the first question to consider is whether the framework even applies here. More specifically, plaintiff acknowledges that a European-style pheasant hunt is a "recreational activity," but he argues on appeal that his claim remains subject to pre-*Ritchie-Gamester/Bertin* case law that applied the ordinary-negligence standard to hunting. Plaintiff maintains that this is justified on policy grounds because a firearm is a dangerous instrumentality and its use should be subject to a stricter standard than mere reckless misconduct.

Plaintiff is correct that hunting is a recreational activity. While a European-style pheasant hunt is a specialized form of hunting, broadly speaking, hunting is a physical activity performed outdoors for enjoyment, relaxation, and exercise. (This is not to ignore the fact that hunting is much more than a recreational activity, as hunting can also serve as a vital source of sustenance for people and as a natural-resource management tool for the state.) Hunting is subject to extensive official rules and unofficial practices, see, e.g., MCL 324.43501 to MCL 324.43561, and it can be performed alone or with other hunters. Not surprisingly, hunting has long been recognized by our Legislature and courts as a recreational activity. See, e.g., MCL 324.73105 (classifying hunting, fishing, and trapping as recreational activities); *DiFranco v Pickard*, 427 Mich 32, 86; 398 NW2d 896 (1986) (categorizing hunting as a recreational activity).[1]

Despite this, plaintiff argues that the *Ritchie-Gamester* Court did not intend to include hunting within its new analytical framework, but a review of the decision belies this argument. As noted earlier, the majority began its analysis by reviewing the then-current "state of Michigan law regarding the appropriate standard of care in the *recreational activity* context." *Ritchie-Gamester*, 461 Mich at 77 (emphasis added). The first two cases that the majority considered involved fishing and hunting, *id.* at 77-78, and, as it subsequently summarized the law of this state, the majority described the activities it reviewed collectively as "recreational," *id.* at 81. At no point did the majority exempt hunting from its framework or otherwise suggest that its framework did not encompass the activity.

In fact, in his separate concurring opinion in *Ritchie-Gamester*, Justice BRICKLEY made clear that he believed that the majority's analysis applied to hunting. For instance, Justice BRICKLEY described the *Felgner* duck-hunting case as a "sports injury case," and later he cited hunting and fishing statistics to support his belief that "recreational sports in Michigan" showed "no sign of any wane" that might justify a change in the standard of care. *Id.* at 96, 98 & n 3 (BRICKLEY, J, concurring). The majority offered a lengthy response to various points made by

---

[1] *DiFranco* was superseded by statute on other grounds, as stated in *McCormick v Carrier*, 487 Mich 180, 190-191; 795 NW2d 517 (2010).

Justice BRICKLEY, *id.* at 90-95 (opinion of the Court), but at no point did the majority suggest that Justice BRICKLEY was mistaken with regard to whether hunting was a recreational activity subject to the majority's reckless-misconduct analytical framework.

Plaintiff insists to the contrary that the majority did, in fact, intend to limit significantly the reach of its framework. This can be seen, according to plaintiff, by considering footnote 9 of the majority's opinion. Based on this footnote, plaintiff concludes that the majority exempted hunting from the reckless-misconduct framework.

This is, however, a misreading of footnote 9. The majority recognized in this footnote that the standard it developed was broadly worded to apply to "all 'recreational activities.' " *Id.* at 89 n 9. At the same time, the majority observed that the "precise scope" of the standard was best left to emerge on a case-by-case basis. *Id.* We understand the majority to mean with this footnote that, when a participant injures a coparticipant in a sport or recreational activity, a court will apply the analytical framework set forth in *Ritchie-Gamester* (as subsequently developed in *Bertin*). The law will then develop on a case-by-case basis, as each court determines whether, in the context of the particular activity, it was a reasonably foreseeable risk that a participant could be injured by a coparticipant in a particular manner. A contrary reading of footnote 9 would suggest that the *Ritchie-Gamester* majority violated the old adage that one should not hide an elephant in a mouse-hole.

In his reply brief, plaintiff further points this Court to MCL 752.861, which criminalizes the careless, reckless, or negligent use of a firearm that kills or injures a person. While violation of a statute can be, under certain circumstances, used to support a common-law claim, see *Randall v Mich High Sch Athletic Ass'n*, __ Mich App __; __ NW2d __ (2020) (Docket No. 346476), plaintiff does not argue that defendant violated the criminal statute or, even if defendant did, that this would support plaintiff's common-law claim. The statute provides little support here, as it does not itself create a statutory civil cause of action and, moreover, "recklessness" and "negligence" in the criminal context are separate and distinct from "recklessness" and "negligence" in the civil context. See *Farmer v Brennan*, 51 US 825, 836-837; 114 S Ct 1970; 128 L Ed 2d 811 (1994) (addressing recklessness in both the criminal and civil contexts); *People v Schaefer*, 471 Mich 418, 438; 703 NW2d 774 (2005) (addressing gross negligence in the criminal-law context); *Cichewicz v Salesin*, 306 Mich App 14, 28-29; 854 NW2d 901 (2014) (addressing gross negligence in the civil-law context); *People v Williams*, 244 Mich App 249, 254; 625 NW2d 132 (2001) ("[A] civil action is completely separate and independent from a criminal action."); *Aetna Cas & Surety Co v Collins*, 143 Mich App 661, 663; 373 NW2d 177 (1985) ("Criminal and civil liability are not synonymous.").

Lastly, plaintiff argues that public policy favors rejection of the *Ritchie-Gamester/Bertin* framework in the hunting context because, if the reckless-misconduct standard is applied to firearm-related recreational activities, participants would be permitted to ignore certain rules of firearm safety without the fear of litigation. This argument is similar to one made by Justice BRICKLEY in his separate opinion in *Ritchie-Gamester*. In response to the majority's position that an ordinary-negligence standard would be insufficient to "encourage[] vigorous participation in recreational activities," *Ritchie-Gamester*, 461 Mich at 89 (opinion of the Court), Justice BRICKLEY countered, "[I]t is just as likely that many would choose not to participate in these activities because the recklessness standard might encourage dangerous behavior or make it too

difficult for participants to recover in the event they are injured," *id.* at 99-100 (BRICKLEY, J, concurring).  Although both the majority and Justice BRICKLEY made valid points on the question of which standard best encourages participation in recreational activities, the majority's position ultimately won the day.

And regardless, plaintiff's specific argument is too sweeping in its scope.  If the use of a dangerous instrumentality was alone sufficient to justify carving out hunting from the *Ritchie-Gamester*/*Bertin* framework, then this logic would presumably apply to several other sports and recreational activities as well, including fencing, archery, javelin throw, and competitive firearm shooting.  Adoption of plaintiff's position would result in the very "bowdlerization" of the law for sports and recreational activities against which the majority expressly warned in *Ritchie-Gamester*, 461 Mich at 91.  Cf *Konrad v Morant*, 89 Ohio App 3d 803, 806; 627 NE2d 1007 (1993) (explaining that "the focus in determining whether an activity is recreational is not on the instrument used in the activity but on the expectations of the participants" and holding that a game of "BB Gun War" was a recreational activity subject to a recklessness standard of care).

With that said, courts cannot ignore the dangerousness of an instrumentality used in a sport or recreational activity.  The instrumentalities used in bowling and basketball, for example, present much different risks than those used in golf and hunting.  Each instrumentality, as it is used in a specific activity, will present risks that differ in degree and in kind from an instrumentality used in another activity.  The risks posed by an instrumentality in a particular activity are too fact-specific to make sweeping exemptions from the *Ritchie-Gamester*/*Bertin* framework.  Instead, the risks are best considered at the next stage of the analysis—i.e., whether a particular risk of injury was reasonably foreseeable under the circumstances.

It is to this question that we now turn.

## C. QUESTION OF FACT ON REASONABLE FORESEEABILITY

Although the *Ritchie-Gamester*/*Bertin* framework applies, we must consider whether the particular risk that gave rise to plaintiff's injury was inherent to the recreational activity.  Father and son were experienced hunters, well-versed in hunter-safety rules, standing shoulder-to-shoulder in the same blind, and shooting away from each other.  Plaintiff concedes that there was an inherent risk that he could have been shot by a hunter in a blind directly across from him, but he argues that being shot by defendant did not present the same type of risk.

As the *Bertin* Court made clear, whether a particular risk of harm was inherent to a recreational activity is a question of fact.  The test is an objective one, i.e., it is based on "what risks a reasonable participant, under the circumstances, would have foreseen," *Bertin*, 502 Mich at 621, so a party's subjective evaluation of the circumstances and tolerance for risk are irrelevant.  This does not mean, however, that the parties' observations are likewise irrelevant and can be ignored—rather, the observations must be considered from the viewpoint of the common law's "reasonable participant."

Like other sports and recreational activities, hunting in general poses known risks to the participants.  While it would be unexpected in everyday life for a person to discharge a firearm

-9-

near another person, a hunter that is participating in a pheasant hunt with other hunters is on notice that firearm activity is taking place in close physical proximity.

And yet, on review of this record, we conclude that there remains a genuine issue of material fact on whether the risk of being shot by defendant was reasonably foreseeable to someone in plaintiff's position. On the one hand, it is well known that, ceteris paribus, the use of a firearm during hunting poses some risk of harm; it is, after all, a dangerous instrumentality. Hunting in general and the pheasant hunt in particular had extensive rules in place to reduce the risk of harm from a firearm. Plaintiff knew that his father could be careless with a firearm, and it can also be presumed that plaintiff knew that his father had several medical conditions that could affect the handling of a firearm. This evidence points to a foreseeable risk.

On the other hand, the two men had hunted together regularly over many years, and neither testified about a prior similar incident. Defendant was well-versed in the rules of hunting, including this particular style of hunting, and plaintiff knew this. Weather conditions were good, and there is nothing in the record to suggest that defendant had tingling in his hands at the time of the incident.

It is also important to consider the specific way in which plaintiff was shot. He was not, for example, shot by another hunter across the perimeter in another blind. It might very well have been reasonably foreseeable that plaintiff was at risk of being shot by a hunter from another blind. We need not decide the issue, however, because that was not the specific risk that unfortunately became a reality here. Rather, plaintiff was hit by an experienced, knowledgeable hunter, who plaintiff knew very well, and who stood shoulder to shoulder with plaintiff while they shot outward from a blind at pheasants flying overhead. On this record, it remains a question of fact whether it was reasonably foreseeable to plaintiff that there was a risk that defendant would discharge his shotgun and injure plaintiff.

Accordingly, we affirm in part and reverse in part the trial court's orders with respect to the applicable standard of care. On remand, if the finder of fact concludes that the risk was reasonably foreseeable, then defendant owed a duty only to refrain from reckless misconduct. If the finder of fact concludes otherwise, then defendant owed a duty to exercise ordinary care.

## III. CONCLUSION

Hunting is a recreational activity subject to the standard-of-care framework set forth by our Supreme Court in *Ritchie-Gamester* and *Bertin*. If a particular risk of injury is reasonably foreseeable (i.e., the risk is "inherent" to hunting), then a hunter will be held to a reckless-misconduct standard of care when dealing with another hunter in the party; if not, then the hunter will be held to the ordinary-negligence standard. The inquiry is a factual one, and, on this record, we conclude that there remains a genuine issue of fact on whether it was reasonably foreseeable that defendant would shoot and injure plaintiff.

Affirmed in part and reversed in part. The matter is remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Jane E. Markey
/s/ Michael J. Kelly